*Christy J. Mathis and Paul J. Mathis, individually vs*
*Mosinee School District, et al*

---

*Eric J. Krause*
*December 13, 2022*

---



**Grossbier & Associates, Inc.**
COURT REPORTERS

*www.grossbierandassociates.com  •  gainc@wctc.net*
*1 (800) 706-0691*

Providing professional service in these counties:
Adams, Clark, Columbia, Green Lake, Jackson, Juneau,
Langlade, Lincoln, Marathon, Monroe, Oneida, Outgamie,
Portage, Sauk, Taylor, Wood, Waupaca and Waushara.

Schedule depositions at:
www.grossbierandassociates.com or gainc@wctc.net

Video Depositions by Video Specialists, LLC

*Min-U-Script® with Word Index*

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 5

```
 1                OBJECTION INDEX
 2  BY:                              PAGE:
 3  Mr. Roman      18, 19, 20, 24, 27, 31, 33, 34, 35,
                   40, 42, 45, 46, 48, 54, 57, 60, 63,
 4                 65, 66, 67, 70, 72, 73, 74, 78, 81,
                   82, 83, 84, 85, 86, 87, 88, 89, 90,
 5                 91, 92, 96, 100, 101, 103, 105,
                   106, 107, 110, 111, 112, 113, 116,
 6                 117, 119, 120, 122, 123, 124, 125,
                   127, 128, 130, 131, 134, 135, 140,
 7                 141, 145, 146, 147, 152, 153, 154,
                   155, 157, 159, 163, 164, 165, 166,
 8                 168, 171, 172, 173, 177, 178, 184,
                   185, 187, 190, 195, 197, 199, 200,
 9                 201, 204, 206, 208, 209, 212, 213,
                   214, 219, 223, 224, 225, 226, 227,
10                 228, 230, 232, 233, 234, 236, 237,
                   238, 239, 240, 241, 243, 244, 247,
11                 248, 249, 250, 257, 258, 259
12
13  Ms. Lubinsky   19, 20, 28, 57, 58, 60, 61, 63, 64,
                   65, 66, 67, 70, 72, 73, 81, 82, 83,
14                 84, 85, 86, 87, 88, 89, 90, 91, 92,
                   96, 100, 101, 103, 104, 105, 106,
15                 107, 109, 110, 111, 112, 113, 116,
                   117, 119, 120, 121, 123, 124, 125,
16                 135, 141, 146, 151, 153, 154, 155, 163,
                   165, 166, 168, 171, 177, 184, 185,
17                 187, 190, 195, 199, 200, 201, 204,
                   206, 208, 209, 212, 213, 214, 219,
18                 223, 224, 225, 226, 227, 228, 229,
                   230, 232, 233, 236, 237, 238, 239,
19                 240, 241, 243, 244, 247, 249, 250,
                   257, 258
20
21  Ms. Zellner    19, 20, 23, 24, 25, 28, 29, 33, 35,
                   40, 42, 45, 46, 48, 52, 54, 57, 58,
22                 60, 61, 63, 65, 66, 67, 70, 72, 73,
                   74, 78, 81, 82, 83, 84, 85, 86, 87,
23                 88, 89, 90, 91, 92, 94, 95, 96,
                   100, 101, 103, 104, 105, 106, 107,
24                 109, 110, 111, 112, 113, 116, 117,
                   119, 120, 121, 122, 123, 124, 125,
25  (Objections continue to next page)
```

Page 6

```
 1  (Objections index continued)
 2                 126, 127, 128, 129, 130, 131, 135,
                   141, 146, 151, 152, 153, 154, 155,
 3                 163, 165, 166, 168, 171, 173, 177,
                   179, 184, 185, 187, 190, 195, 199,
 4                 200, 204, 206, 207, 208, 209, 212,
                   213, 214, 218, 219, 223, 224, 225,
 5                 226, 227, 228, 229, 230, 233, 234,
                   236, 237, 238, 239, 240, 241, 242,
 6                 243, 244, 247, 248, 249, 250, 257,
                   258
 7
 8
 9
10
11                     REQUESTS
    ITEM:                             PAGE:
12
    (No requests were made during
13  the taking of this deposition.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1          ERIC J. KRAUSE,
 2  called as a witness, after being first
 3  duly sworn, was examined and testified
 4  as follows:
 5              EXAMINATION
 6  BY MR. SECUNDA:
 7  Q. Good morning, Officer Krause.
 8  A. Good morning.
 9  Q. How are you today?
10  A. I'm pretty well.  Yourself?
11  Q. Good.  I am Paul Secunda.  And along with my
12     colleague, Kirsten Hendra, we represent the
13     Mathises in this case involving a number of
14     parties, including yourself.
15         So I'm going to go through some ground
16     rules just so you, you know, know that there's
17     no tricks here.  This is just basic information
18     we're getting for the record.  So let's start
19     with just, please, state your full name.
20  A. Eric James Krause.
21  Q. Okay.  And can you spell your last name for the
22     record.
23  A. Sure.  K-r-a-u-s-e.
24  Q. Okay.  I'm going to call you Officer Krause.
25  A. That's fine.
```

Page 8

```
 1  Q. Are you currently taking any prescription
 2     medication, officer?
 3  A. I am.
 4  Q. Okay.  What is the name of the medication?
 5  A. I don't recall.
 6  Q. Can you at least identify the doctor that
 7     prescribed the medication?
 8  A. Jane Ziemanski.
 9  Q. And what type of a doctor is that?
10  A. Just my -- a general doctor.
11  Q. Okay.  And what's the location of the practice?
12  A. Marshfield Clinic.
13  Q. Okay.  And when did your physician first
14     prescribe the medication?
15  A. I don't recall.
16  Q. And do you take it for a particular condition?
17  A. Not a condition, no.
18  Q. So let me explain to you why I'm asking these
19     questions.
20  A. Sure.
21  Q. I want to make sure you're not under the
22     influence of any substance that might interfere
23     with your memory or interfere with your
24     recollection today at the deposition.
25  A. No.
```

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

---

Page 9

1 Q. Okay. Are you aware of any reason why you
2    would be unable to fully and completely
3    exercise your memory during this deposition?
4 A. No.
5 Q. Okay. In your lifetime have you ever been
6    known by a different name or by an alias?
7 A. No.
8 Q. Where do you currently reside?
9 A. In the town of Mosinee.
10 Q. And how long have you lived there?
11 A. 13 years.
12 Q. Okay.
13 A. 13, 14.
14 Q. Okay. And have you ever given a deposition
15    testimony prior to today?
16 A. No.
17 Q. So let me go over some ground rules just so
18    Meredith is happy with both of us.
19 A. Okay.
20 Q. Because she's truly the boss in the room today.
21    Inevitably, when we have a conversation we're
22    going to talk over each other.
23 A. Okay.
24 Q. Because that's just how people converse. Try
25    not to as best you can. Wait to the end of my

---

Page 10

1    question. I will do my best to wait to the end
2    of your answer.
3        If you have to say yes or no, please
4    don't shake your head or nod your head.
5    Actually vocalize it so that it can be taken
6    down on the record.
7        If at any time you need to take a
8    break, please finish answering the question,
9    whatever the question is outstanding. And then
10    you can ask your attorney or me and say, is it
11    okay if we take a break?
12        We're going to give you a break.
13    Whether it's restroom or just to take, you
14    know, a walk around, whatever it is, doesn't
15    matter. We're here to make sure that you're
16    comfortable. And if you need a break just let
17    us know. Okay?
18 A. Okay.
19 Q. Okay. So with that out of the way as far as
20    kind of the basics of the deposition, so you
21    were notified that Mr. and Mrs. Mathis intended
22    to take your deposition?
23 A. Correct.
24 Q. And when were you notified?
25 A. I would have to -- I don't recall the date. I

---

Page 11

1    would have to look at my file. But I was given
2    an official document --
3 Q. Okay.
4 A. -- that would be a notification of deposition.
5 Q. And who informed you of that fact?
6 A. My attorney.
7 Q. And when were you informed?
8 A. I would have to look at the exact date.
9 Q. And I don't want you to say anything that you
10    said to your attorney because that is
11    privileged. But did anyone besides you and
12    your attorneys take part in that discussion
13    about this document about the deposition?
14 A. No.
15 Q. Okay. Okay. So now I'm going to ask you what
16    you did to prepare for the deposition today.
17    Did you review any documents?
18 A. I did.
19 Q. Can you identify the documents you reviewed?
20 A. It would have been my report.
21 Q. When you say your report do you mean your
22    report that you did as part of your role as a
23    student resource officer, or are you talking
24    about the criminal report?
25 A. The criminal reports.

---

Page 12

1 Q. Okay. And did you review any other documents
2    besides your criminal report?
3 A. Pretty much everything inside of the case file,
4    our case file at the police department.
5 Q. Again, I don't want to know your conversations
6    with your attorney. But did you speak to
7    anyone else when you prepared for the
8    deposition today?
9 A. As in, what do you mean -- I don't know what
10    you mean by that question.
11 Q. So besides your attorneys for this case, did
12    you speak to any other officers? Did you speak
13    to any family members as far as getting ready
14    for this deposition today?
15 A. They're just aware that I'm here, but not to
16    prepare for it.
17 Q. Okay. Is there any reason you spoke to certain
18    individuals to the exclusion of others?
19 A. Just to let them know that I was here.
20 Q. Okay.
21 A. So we had road coverage.
22 Q. Okay. Did you communicate to any individual
23    that you were testifying at this deposition
24    today?
25 A. To the people I work with, yes.

---

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

---

Page 13

1 Q. Okay. And what were the substance? Just that
2   you were needing coverage for your road duty?
3 A. Just for the deposition.
4 Q. Okay. We're going to move on to your
5   education --
6 A. Sure.
7 Q. -- background. Can you please describe for me
8   all of your post-high school education and/or
9   training?
10 A. Attended Northcentral Technical College,
11   received my associate's degree there in
12   criminal justice, and then just necessary
13   training that law enforcement would go through
14   throughout the last 16 years.
15 Q. And we'll go through some of the training that
16   you went through later in this deposition. But
17   for now, where did you attend, did you say,
18   school?
19 A. Northcentral Technical College.
20 Q. Did you attend any other schools besides
21   Northcentral?
22 A. No.
23 Q. And what years did you attend?
24 A. I believe 2005 to 2007. 2004-2007.
25 Q. Okay. And your major was criminal justice?

Page 14

1 A. Yes.
2 Q. And what kind of degree did you earn?
3 A. Criminal justice.
4 Q. Is that an associate's degree? Is that a
5   bachelor's degree? Do you know?
6 A. Associate's.
7 Q. It's an associate's degree. And from
8   Northcentral did you get any additional
9   certificates or anything of that nature?
10 A. Education based?
11 Q. Education-based certificates based on your
12   going to school at Northcentral.
13 A. You complete the academy. But it's not a
14   certificate that you get.
15 Q. Just so I'm clear, so you simultaneously
16   complete police academy and your criminal
17   justice training at Northcentral -- or excuse
18   me. Let me restate that -- your criminal
19   justice education at Northcentral?
20 A. I got my education, my associate's, at
21   Northcentral. And then I completed the police
22   academy at Northcentral after my education.
23 Q. Right after each other?
24 A. The following spring or the following fall of
25   my graduation.

Page 15

1 Q. Do you recall your GPA at Northcentral?
2 A. I think it was around 3.0.
3 Q. Okay.
4 A. May be a little higher.
5 Q. Okay. Okay. So let's go away from education
6   and into your employment history. I want to
7   talk about your employment pre-Mosinee Police
8   Department. Where did you first work when you
9   left the police academy?
10 A. Wood County Sheriff's Department.
11 Q. And what was your position there?
12 A. I was a part-time deputy that patrolled the
13   parks.
14 Q. Okay. And how many hours a week did you work?
15 A. Maybe five. It was -- you would pick up shifts
16   when you would -- so there was no set schedule.
17 Q. Got it. And then after that what was your next
18   position?
19 A. Full time at Lincoln County Sheriff's
20   Department as a deputy.
21 Q. You were a deputy sheriff at Lincoln?
22 A. Yes.
23 Q. And do you remember the years that you were a
24   deputy there?
25 A. 2007 to 2014.

Page 16

1 Q. And did you have any special area of focus?
2   Any types of investigations you did
3   particularly?
4 A. There was -- just a road officer. So there was
5   no particular -- I wasn't a detective or
6   anything specialized. I was just a road
7   officer.
8 Q. Okay. And so when you left Lincoln County in
9   2014, is that when you came to Mosinee?
10 A. Yes.
11 Q. And why did you leave Lincoln?
12 A. Because it was a potential of the school
13   resource officer opening.
14 Q. So tell me a little bit about that. Have you
15   always been interested in being a school
16   resource officer?
17 A. Yes.
18 Q. And why is that?
19 A. I like the idea of being able to work with
20   kids. You can actually see a change and make a
21   change with kids early on. It's a lot
22   difficult -- lot more difficult with an adult
23   to make that change.
24 Q. Interesting. Okay. And so from 2014 to the
25   present, have you been a school resource

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 17

1 officer, or is that just part of your
2 employment at Mosinee?
3 **A. That's part of my employment. That's my**
4 **assignment. My job is a police officer. But**
5 **my assignment is the school.**
6 Q. So your employer is the Mosinee Police
7 Department?
8 **A. Yes.**
9 Q. And you receive your pay and your benefits from
10 the Mosinee Police Department?
11 **A. Correct.**
12 Q. And do you remember what year you began as a
13 school resource officer?
14 **A. I got hired in 2014 in October. And I would**
15 **have started the school position in the**
16 **beginning of 2015 in January.**
17 Q. Okay. And when you start as a school resource
18 officer, do you have to do training prior to
19 assuming that role?
20 **A. No.**
21 Q. Do you do training once you're in that role to
22 learn about how to interact with children?
23 **A. It's not required, but yes, I have.**
24 Q. Okay. And we'll come back to that. And I'm
25 also trying to understand what your

Page 18

1 relationship is to the -- to the people in
2 charge at Mosinee. And you were -- I should
3 ask this first. Were you always at Mosinee
4 Middle School?
5 **A. I cover all three schools.**
6 Q. Okay. Where do you -- where do you sit? Or do
7 you sit at all three schools?
8 **A. I have an office in our -- it's called our**
9 **Kreske Center. It's in the middle of the high**
10 **school and the middle school. And then I have**
11 **an office at the elementary school.**
12 Q. So what elementary school is it?
13 **A. Mosinee Elementary.**
14 Q. And it's Mosinee Middle School?
15 **A. Yes.**
16 Q. And it's Mosinee High School?
17 **A. Correct.**
18 Q. Okay. And so you are responsible for all three
19 schools?
20 **A. Yes.**
21 Q. What is your relationship to the principals of
22 the various schools? Are you in any way
23 subordinate to them?
24 **A. I don't --**
25         **MR. ROMAN: I'll object to the form.**

Page 19

1             **EXAMINATION**
2     **BY MR. SECUNDA:**
3 Q. You can answer.
4 **A. I don't take any directives from**
5 **administration. I only take directives from**
6 **the chief of police.**
7 Q. So how would you characterize your
8 relationship, let's say, with Principal Grube
9 as far as kind of interacting with him?
10         **MS. LUBINSKY: I'm going to object to**
11 the form. You may answer.
12         **MR. ROMAN: I'll join.**
13         **MS. ZELLNER: I'll join as well.**
14             **EXAMINATION**
15     **BY MR. SECUNDA:**
16 Q. There's going to be a chorus all day, so don't
17 let it bother you. I'm trying not to let it
18 bother me.
19         So let me restate the question so it's
20 a little clearer. I'm trying to understand
21 whether or not you take directives from any of
22 the principals in any of the schools that you
23 work at.
24         **MS. ZELLNER: Object to form.**
25         **MS. LUBINSKY: I'll join.**

Page 20

1         **MR. ROMAN: So will I.**
2             **EXAMINATION**
3     **BY MR. SECUNDA:**
4 Q. You can answer.
5 **A. No.**
6 Q. Okay. So if Principal Grube needed you with a
7 student altercation and asked for your
8 assistance, you could not go?
9 **A. Correct.**
10 Q. But you wouldn't?
11         **MS. LUBINSKY: Object to the form.**
12         **MS. ZELLNER: Object to form.**
13         **MR. ROMAN: So will I.**
14         **COURT REPORTER: Was there an answer?**
15 I'm sorry.
16         **MR. SECUNDA: I don't think there was**
17 an answer. But I'll withdraw the question.
18         (Discussion held off the record.)
19             **EXAMINATION**
20     **BY MR. SECUNDA:**
21 Q. Can you, Officer Krause, describe to me how you
22 split your time between the school and your
23 other police duties?
24 **A. I don't have a set schedule. It's wherever I**
25 **decide for that particular day to spend my**

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 21

1  time. So if I'm needed in a particular school
2  for a presentation or questions, I will find
3  myself there. Otherwise I patrol all three
4  schools every day.
5  Q. Would you characterize your duties at school as
6  your primary responsibility?
7  A. My primary responsibility is as a road officer.
8  Q. So how would you characterize your
9  responsibilities at the school?
10 A. It would be an assignment.
11 Q. Okay. Okay. So let's move on from that. And
12 I'm going to ask you, are you familiar with an
13 individual named Christy J. Mathis?
14 A. Yes.
15 Q. And how are you familiar?
16 A. She was an employee at the Mosinee School
17 District.
18 Q. Okay. Have you ever had any occasion to
19 socialize with Ms. Mathis outside of work?
20 A. Outside of work? I don't recall.
21 Q. Have you ever run into her in Mosinee or any
22 other area in this neck of the woods?
23 A. I don't recall.
24 Q. Okay. So you are aware that Mr. and Mrs.
25 Mathis filed a complaint against you and other

Page 22

1  defendants in the United States District Court
2  for the Western District of Wisconsin, correct?
3  A. Correct.
4  Q. And how were you informed of the lawsuit?
5  A. I was served paperwork by a server.
6  Q. Okay. And do you remember when that was, when
7  you were informed?
8  A. I do not.
9  Q. And what was -- the manner of communication was
10 in the form of a process server?
11 A. Yes.
12 Q. Okay. And did you have any conversation with
13 the process server?
14 A. No.
15 Q. And let me see. One second, please. So what
16 is your understanding, officer, of the nature
17 of the Mathises' lawsuit against you?
18 A. Based off of what my understanding is, is they
19 don't agree with the arrest.
20 Q. Okay. So you think this is -- this case that
21 we've brought is just about the arrest of
22 Ms. Mathis?
23 A. On my end of it, yes.
24 Q. Okay. And how did you arrive at that
25 understanding?

Page 23

1  A. That was --
2      MS. ZELLNER: Object to form if it
3  calls for anything attorney-client.
4      EXAMINATION
5  BY MR. SECUNDA:
6  Q. Yes. Please don't respond in any way
7  discussing what you and your attorney have
8  discussed. But outside of your attorney
9  discussions, how did you arrive at that
10 conclusion?
11 A. Just my opinion.
12 Q. Okay. And outside of your attorney have you
13 shared your understanding of the nature of this
14 lawsuit with anyone?
15 A. Yes.
16 Q. And who would that be?
17 A. My wife.
18 Q. And what did you say to her?
19 A. Same thing I just told you, that she doesn't
20 agree with the arrest, and I have a federal
21 lawsuit now.
22 Q. And why do you think she doesn't agree with the
23 arrest?
24 A. I have no idea.
25 Q. You have no idea why you're sitting here today?

Page 24

1      MS. ZELLNER: Object to form.
2      EXAMINATION
3  BY MR. SECUNDA:
4  Q. You can answer.
5  A. She doesn't agree with the arrest.
6  Q. So sitting here today, you don't think you did
7  anything wrong with regard to arresting
8  Ms. Mathis?
9  A. Absolutely not.
10 Q. Okay. Are you aware of the existence of any
11 written documentation where you have expressed
12 your understanding of Mrs. Mathis' lawsuit?
13 A. Can you --
14 Q. Yes.
15 A. -- rephrase it?
16 Q. Yes. I'll repeat that, sure. Are you aware of
17 any written documentation in which you express
18 your understanding of this lawsuit that we're
19 discussing today?
20      MR. ROMAN: I'll object to form.
21      EXAMINATION
22 BY MR. SECUNDA:
23 Q. You can answer, unless you want me to restate
24 it one more time.
25 A. No. What type of a form? I'm confused on the

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 25

1 question.
2 Q. Okay. Is there any written document that -- in
3 which you have written your understanding of
4 what this lawsuit's about?
5 A. I believe it would have been the response to
6 the lawsuit.
7 Q. So you helped in forming the response to the
8 complaint in this lawsuit?
9 A. Yes.
10 MS. ZELLNER: Object if it's asking
11 for attorney-client communications.
12 EXAMINATION
13 BY MR. SECUNDA:
14 Q. I'm not asking for attorney-client privilege.
15 Just asking whether you participated in that
16 process. And your answer is yes?
17 A. Yes.
18 Q. Okay. So I think you've already answered this
19 question, but I'm going to ask it for the
20 record. Do you hold any opinions regarding the
21 merits of the Mathises' lawsuit against you?
22 MS. ZELLNER: Object to form.
23 EXAMINATION
24 BY MR. SECUNDA:
25 Q. You can answer.

Page 26

1 A. Can you repeat the question?
2 Q. Sure. Do you hold any opinions regarding the
3 merits of the Mathises' lawsuit against you?
4 A. Yes.
5 Q. And what are those opinions?
6 A. I'll keep those to myself.
7 Q. Sir, you have to answer. You're under oath.
8 And this is something that's part of the case.
9 A. I don't agree with the lawsuit.
10 Q. And you don't agree with the lawsuit because?
11 A. I did nothing wrong. So that was -- that's my
12 opinion.
13 Q. Okay. Let's move on then with that being said.
14 And I understand your position. Let's talk
15 about your employment at the Mosinee Police
16 Department. You previously testified that you
17 are currently employed at the Mosinee Police
18 Department?
19 A. Yes.
20 Q. And you previously testified before that you
21 were employed as a deputy sheriff at Lincoln
22 County?
23 A. Yes.
24 Q. Did you have any disciplinary issues when you
25 were at Lincoln County?

Page 27

1 A. I've never been disciplined in my career.
2 Q. You've never been disciplined in your career?
3 A. No.
4 Q. And how do you define discipline?
5 A. Any type of a punishment that would be spoke on
6 or have a letter in my file.
7 Q. Have you ever been referred for criminal
8 charges, officer?
9 A. Referred for criminal charges? No.
10 Q. Was there ever an investigation into whether
11 you committed a criminal act?
12 A. Yes.
13 Q. And what was that, officer?
14 A. It was a DCI investigation in regards to a
15 12-hour violation rule for juvenile law.
16 Q. Can you explain that to us?
17 A. It says I have 12 hours to respond to CPS in
18 regards to a caretaker that may have violated
19 the law physically or, like, an assault.
20 Q. So what is CPS, just for the record?
21 A. Child Protective Services.
22 Q. And so in what situation did you not report
23 within that 12-hour period to Child Protective
24 Services?
25 MR. ROMAN: Object to form.

Page 28

1 MS. ZELLNER: Object to form.
2 MS. LUBINSKY: I'll join.
3 (Discussion held off the record.)
4 EXAMINATION
5 BY MR. SECUNDA:
6 Q. So let me restate the question, if you don't
7 mind.
8 A. Okay.
9 Q. For what incident were you, I guess the word
10 is, investigated for not reporting a 12-hour --
11 within 12 hours this child situation?
12 A. I was investigated for not reporting -- what
13 they believe, not reporting in 12 hours for the
14 Mathis case.
15 Q. Okay. So if I'm correct, you have 12 hours
16 once you are aware that a child might be
17 endangered or having been subjected to a
18 criminal act?
19 A. Correct.
20 Q. Okay. And you did not report?
21 A. I did.
22 MS. ZELLNER: Object to form.
23 EXAMINATION
24 BY MR. SECUNDA:
25 Q. So is your testimony, Officer Krause -- well,

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 29

1   let me lay a foundation for this a little bit.
2   So when did you become aware that Ms. Mathis
3   had been accused by students in her class of
4   inappropriate touching?
5   **A. April 5th.**
6   Q. So you did not know on March 25, 2021 that this
7   incident had occurred?
8          MS. ZELLNER: Object to form.
9          EXAMINATION
10   BY MR. SECUNDA:
11   Q. You can answer.
12   **A. Not to the extent. So I knew something**
13   **occurred. I was not informed to what extent it**
14   **occurred.**
15   Q. And you were not informed as far as the extent
16   of what occurred on March 26, 2021?
17   **A. Correct.**
18   Q. And you weren't informed until April the 5th
19   2021?
20   **A. About 8:30. That's when I was informed on**
21   **April 5th.**
22   Q. So just so I have this cleaned up, so the first
23   time you became aware that a student had
24   allegedly been inappropriately touched by
25   Ms. Mathis was at 8:30 a.m. or so on the

Page 30

1   morning of April the 5th 2021?
2   **A. Yes. With an inappropriate touch, yes.**
3   Q. Okay. And I'll come back to that because,
4   obviously, that's the focus of this case. So I
5   want to go back to your employment history.
6          And I think you've answered most of
7   these questions already about kind of the
8   relationship between the Mosinee Police
9   Department and your role as resource officer.
10   But just a few more questions. Did you apply
11   to become a school resource officer?
12   **A. Yes.**
13   Q. And there was an application process?
14   **A. Yes.**
15   Q. Do you remember what was part of that
16   application process?
17   **A. It was a letter of interest as well as an**
18   **interview in front of a panel.**
19   Q. Okay. And do you know if there were other
20   candidates when you applied?
21   **A. Yes.**
22   Q. And do you know how many other candidates there
23   were?
24   **A. One.**
25   Q. So out of two people, you were selected in, I

Page 31

1   assume, the fall of 2014 for this school
2   resource officer position at the Mosinee
3   schools?
4   **A. Would have been the beginning of 2015, January.**
5   Q. Okay. Let me also ask a few more questions
6   about your police department job. What are the
7   names of your direct supervisors?
8          MR. ROMAN: I'll just object. Can you
9   put a point in time?
10          MR. SECUNDA: Sure.
11          EXAMINATION
12   BY MR. SECUNDA:
13   Q. What is the name of your direct supervisor
14   presently at the Mosinee Police Department?
15   **A. It would be Kenneth Grams and then whoever the**
16   **senior officer is at that particular time if**
17   **our current police chief is not there.**
18   Q. Okay. So right now you do have a police chief
19   in Mosinee?
20   **A. Yes.**
21   Q. And that is Chief Grams?
22   **A. Correct.**
23   Q. And when you say if there is not another senior
24   police officer -- well, let me restate that.
25   When Chief Grams -- let me restate that again.

Page 32

1   So right now Chief Grams is your supervisor?
2   **A. Yes.**
3   Q. Is he your direct supervisor?
4   **A. Yes.**
5   Q. So you don't report to anyone first before you
6   report to Chief Grams?
7   **A. Correct.**
8   Q. There's not a lieutenant or any other senior
9   officer?
10   **A. Correct.**
11   Q. Do you remember when Chief Grams became the
12   police chief at the Mosinee Police Department?
13   **A. I do.**
14   Q. When was that?
15   **A. I don't recall the exact date. But it would**
16   **have been in -- I believe it was in -- I**
17   **believe it was in May.**
18   Q. May of 2021?
19   **A. Yes.**
20   Q. And prior to Chief Grams being the police chief
21   in May of 2021, who was the police chief of the
22   Mosinee Police Department?
23   **A. Ken Muelling.**
24   Q. And how long was Ken Muelling the police chief
25   of the Mosinee Police Department?

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 33

1 A. He was there prior to me. I believe he was
2   police chief for over 15 years.
3 Q. So when you started at Mosinee Police
4   Department in 2014, Chief Muelling was in
5   charge?
6 A. Yes.
7 Q. And did you directly report to Chief Muelling?
8 A. Yes.
9 Q. So there was no intermediate senior officer who
10   you reported to first?
11 A. Correct.
12 Q. And do you remember when Chief Muelling left
13   the Mosinee Police Department?
14 A. I don't recall.
15 Q. Was there a time period between Chief Muelling
16   leaving and Chief Grams starting?
17 A. Yes.
18 Q. Do you know the length of that time period?
19 A. It was a few months.
20 Q. And in those type of circumstances when there's
21   not a chief of police, how is the department
22   supervised? Who's in charge?
23         MR. ROMAN: Object to form.
24         MS. ZELLNER: Object to form.
25         MR. SECUNDA: Let me restate it. I

Page 34

1   understand.
2         EXAMINATION
3   BY MR. SECUNDA:
4 Q. Who is in charge of the Mosinee Police
5   Department when there is not a chief of police,
6   like you've testified, in a couple-month period
7   of 2021?
8         MR. ROMAN: And we'll object. But go
9   ahead.
10         THE WITNESS: I don't know.
11         EXAMINATION
12   BY MR. SECUNDA:
13 Q. So when Chief Muelling left -- which we can
14   establish later for the record. But we're
15   going to say it's in March of 2021. And before
16   Chief Grams started, which again we can -- and
17   you've kind of stated May of 2021 -- there was
18   a period of time where there wasn't a chief.
19   Correct?
20 A. Yes.
21 Q. So who would you have reported to as your
22   supervisor during that time period?
23 A. The reporting party I would report to would be
24   Officer Stankowski.
25 Q. Okay. And what is Officer Stankowski's full

Page 35

1   name?
2 A. I have -- Jeffrey Stankowski. I don't know
3   what his middle name is.
4 Q. That's okay. And what is the rank of Jeffrey
5   Stankowski?
6 A. Patrolman.
7 Q. So he doesn't have a different rank than you as
8   far as sergeant, lieutenant or anything like
9   that?
10 A. No.
11 Q. Okay. But he is the senior officer; is that
12   correct?
13 A. He's our most senior officer, yes.
14 Q. So -- and I think I understand now. But it
15   seems what you're saying is that, when there's
16   not a chief of police, by default the person in
17   charge is the most senior officer in the
18   department?
19         MR. ROMAN: Object to form.
20   Foundation.
21         MS. ZELLNER: Object to form.
22         EXAMINATION
23   BY MR. SECUNDA:
24 Q. Go ahead. You can answer.
25 A. I don't have that answer on how the structure

Page 36

1   portion of it's set up. That's who I reported
2   to.
3 Q. Officer Stankowski?
4 A. Yeah.
5 Q. So how were you made aware that you were to
6   report to Officer Stankowski during this time
7   period that we're just discussing?
8 A. He'd informed me.
9 Q. Okay. In your position do you have any
10   supervisory duties or responsibilities?
11 A. No.
12 Q. So how many hours during a normal week do you
13   say you work as a school resource officer?
14 A. 40.
15 Q. So in addition to the 40 hours a week that you
16   work as a school resource officer, how many
17   hours a week do you work as a road officer? Or
18   maybe the better word is patrolman.
19 A. Through the school year I am primarily placed
20   in the school. In the summer I am placed out
21   on the road. But our system is set up that the
22   road comes first, school comes second, because
23   my main duty is a patrolman, not a school
24   resource officer.
25         I can give you an example. If we had

Page 37

1 a particular person call in sick, say,
2 yesterday, they would pull me out on the road
3 and say, you are no longer in the school today.
4 You have to cover the road.  Or if we had a
5 particular case, an incident happened out on
6 the road, they would remove me from the school
7 because the road is my primary position.
8      So I don't have an answer for you
9 because every week could be different.  One
10 week -- if all is perfect, I'm in the school a
11 hundred percent of the time during the school
12 year.
13 Q. When you're pulled out of the school to
14   substitute back onto the road duty, does anyone
15   substitute for you at the school?
16 A. No.
17 Q. So there's just no coverage at the school in
18   those situations?
19 A. Correct.
20 Q. Understood.
21      (Krause Exhibit No. 63 marked for
22      identification.)
23      EXAMINATION
24  BY MR. SECUNDA:
25 Q. Officer Krause, I'm putting in front of you --

Page 38

1 A. Can I take this?
2 Q. Please take that one.  I'm putting in front of
3   you -- it's a long reach.  I'm going to show
4   you what has been marked Exhibit 63 for
5   identification purposes.  Can you tell me what
6   that is?
7 A. Looks like it's a training history report.
8 Q. Okay.  Take your time, and leaf through it just
9   to make sure it's exactly what you think it is.
10      MR. ROMAN: While we're on the record,
11 I know we did this with regard to Ms. Mathis'
12 deposition.  But, given that we're now looking
13 at, I believe, records that were provided
14 pursuant to production responses, I don't want
15 to have to go -- all of these were marked and
16 are subject to the protective order.
17      So I'm assuming that we're going to go
18 through the same methodology that we used at
19 Ms. Mathis' deposition as far as, they're
20 marked.  They're not going to be submitted to
21 the court or anything absent a seal.
22      MR. SECUNDA: That is correct.  We
23 have a protective order in place with regard to
24 certain law enforcement records.  And to the
25 extent that they become part of the deposition

Page 39

1 transcript, we will use the same process we
2 used with the students who are protected to
3 make sure that the deposition that's filed with
4 the court is appropriately redacted.
5      MR. ROMAN: And I believe and just --
6 and I think it was in our -- there are certain
7 records that were marked confidential.  And
8 then there were certain records meant
9 protected.  If I recall, we marked them
10 protected.  That might contain particular
11 information that has to be redacted.
12      But if they're confidential we're, at
13 least at this point as far as the discovery
14 response, marking them as confidential.  So
15 they may have to be completely under seal, not
16 just redacted.  And we can talk about that
17 afterwards.
18      MR. SECUNDA: We'll talk about that
19 afterwards.
20      MR. ROMAN: And I'm assuming since you
21 mentioned videos, we'll have to deal with the
22 same thing because there are mentions, as we
23 know, of minor children in some of the videos.
24 So as long as we're all under that
25 understanding.

Page 40

1      MR. SECUNDA: Yeah.  We will work with
2 all the parties to appropriately protect those
3 documents, videos, audio recordings that should
4 be marked confidential or --
5      MR. ROMAN: Protected.
6      MR. SECUNDA: -- protected.
7      MR. ROMAN: Thank you.
8      MR. SECUNDA: Does anyone else have
9 any thoughts on that?  Lori or Kiley?
10      MS. ZELLNER: No.
11      EXAMINATION
12  BY MR. SECUNDA:
13 Q. Okay.  Officer Krause, you've now had a lot of
14   time to look at the training history report.
15   Is this, in fact, a training history report for
16   you?
17 A. It appears to be, yes.
18 Q. Okay.  You've now reviewed it.  Is this a
19   complete and accurate list, Exhibit 63, of all
20   the training you've undertaken?
21      MS. ZELLNER: Object to form.
22      MR. ROMAN: I'll join.
23      EXAMINATION
24  BY MR. SECUNDA:
25 Q. You can answer.

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 41

1  A. I don't know.
2  Q. Well, let me direct your attention to the first
3     page under courses and title. It appears the
4     most recent training date is June 14, 2022. Is
5     that correct?
6  A. Yes.
7  Q. And that is LSB. What does that stand for; do
8     you know?
9  A. I don't know.
10 Q. Handgun qualification course, FY-2022. And
11    then underneath it says 7-1-21 to 6-30-22. Do
12    you see that?
13 A. Yes.
14 Q. Okay. Have you done any training since June
15    14, 2022 that would potentially -- I should --
16    let me restate that. Have you engaged in any
17    police officer training since June 14, 2022?
18 A. No.
19 Q. Okay. I noticed, Officer Krause, on Exhibit 63
20    that, with regard to some of the entries here,
21    you've received training more than once. Is
22    that correct? You don't have to answer yet.
23       Let me give you an example. So, for
24    instance, on the first page if you look at the
25    very bottom, it says, 2021 Badger T-r-a-C-S

Page 42

1  user conference. Do you know what T-r-a-C-S
2  is?
3  A. It's Badger TraCS.
4  Q. Okay. And then if you turn to page 3 -- it's
5     page 3 of 5 -- do you see again at the bottom
6     there's Badger TraCS user conference?
7  A. Yes.
8  Q. So, in fact, there are types of training that
9     you've received more than once?
10 A. These would be yearly trainings.
11 Q. And why is that? Why do you yearly train, for
12    instance, on the Badger TraCS?
13 A. It's a software program that's designed to
14    write citations. And every year the company
15    who designs it puts new features into it for us
16    to learn.
17 Q. Got it. Now, if you look through this training
18    history which we've marked as Exhibit
19    63, can you identify any training you received
20    regarding crimes involving either the sexual
21    assault or sexual abuse of minors?
22       MS. ZELLNER: Object to form.
23       MR. ROMAN: I will join.
24          EXAMINATION
25    BY MR. SECUNDA:

Page 43

1  Q. Please answer. And take your time, too,
2     please.
3  A. Can you repeat your question now that I looked
4     at this?
5  Q. Of course. Can you identify any training you
6     received regarding crimes involving the sexual
7     assault or sexual abuse of a minor?
8  A. I don't see any in here.
9  Q. If you would, can you turn with me to page 2 of
10    5 of Exhibit 63.
11 A. Okay.
12 Q. I'm about six lines down. Do you see where it
13    says, Marsy's Law update?
14 A. I do.
15 Q. What is Marsy's Law?
16 A. I'd have to look at it. I don't recall the
17    definition of it.
18 Q. Does it involve juveniles or minors?
19 A. I'd have to relook at the definition before I
20    would answer it.
21 Q. Okay. And then two entries after that, it
22    states, adolescent mental health training. Do
23    you see that?
24 A. I do.
25 Q. What does that entail, adolescent mental health

Page 44

1  training?
2  A. That would end up dealing with juveniles that
3     would end up having crisis situations with
4     their mental health and how to work with them
5     through crisis.
6  Q. Okay. And then further down maybe another ten
7     lines, do you see where it says, response to
8     online sexual exploitation of children, tools
9     for first responders?
10 A. Yes.
11 Q. Can you tell me what that training was about?
12 A. That training would be designed when we show up
13    on scene to how we would collect data evidence,
14    like a computer.
15 Q. Okay. And then further down -- now I'm about
16    six lines up from the bottom of page 2 of 5 --
17    do you see where it says both school resource
18    office conference and school resource officer
19    training conference?
20 A. Yes.
21 Q. Would there be any training regarding crimes
22    involving the sexual assault or sexual abuse of
23    a minor during one of those conferences?
24 A. I don't recall if during those particular
25    conferences. Those are normally speakers.

Page 45

1 Q. Okay.
2 A. It's not an actual training situation.  It's a
3    public speaker that comes in and talks.
4 Q. So is it your understanding that this training
5    history report is part of your job
6    requirements?
7        MS. ZELLNER: Object to form.
8        MR. ROMAN: Join.
9        EXAMINATION
10 BY MR. SECUNDA:
11 Q. Let me restate it.  Do you have to go through
12    certain forms of training on an annual basis if
13    you are going to be a police officer of the
14    Mosinee Police Department?
15 A. Yes.
16 Q. And is this a form that is used for all police
17    officers, to keep track of their training?
18 A. I've never seen this form before because I
19    don't keep track of my training.  The police
20    chief does.
21 Q. But would you agree that what is listed here is
22    accurate as far as your training?
23        MS. ZELLNER: Object to form.
24        MR. ROMAN: I'll join.
25        EXAMINATION

Page 46

1    BY MR. SECUNDA:
2 Q. You can answer.
3 A. I don't know because I didn't enter these.
4 Q. Is there anything on this training history
5    report for you, officer, that we've marked
6    Exhibit 63 that you would tell me is inaccurate
7    as far as an entry?  And please take your time.
8    Like, look through the whole thing.
9 A. I don't see anything in here that would be
10    inaccurately entered of a training that I
11    didn't receive.
12 Q. Understood.  Now let me ask you this question.
13    Have you received any training not listed on
14    what we've marked as Exhibit 63 regarding the
15    handling or investigating sexual assault of
16    minor cases?
17 A. No.
18 Q. So to conclude, there's nothing in this
19    training history report nor elsewhere where you
20    were trained on how to investigate sexual
21    assault of minor cases?
22        MS. ZELLNER: Object to form.
23        MR. ROMAN: I'll join.
24        EXAMINATION
25    BY MR. SECUNDA:

Page 47

1 Q. Please answer.
2 A. No.
3 Q. Okay.  And this is related, but I just want to
4    make sure that I'm not missing anything.  Did
5    you receive any training on interacting or
6    dealing with children in criminal
7    investigations?
8 A. Yes.
9 Q. Can you describe that training?
10 A. That would be the NASRO training that's
11    designed for school resource officers on how to
12    interact with kids and how to handle
13    situations.
14 Q. And can you explain to me what that type of
15    training entails?
16 A. Just on how we would appropriately handle
17    children in situations in a broad variety of
18    different situations.
19 Q. So can you give me an example of what one thing
20    you learned was as part of that training?
21 A. It would be, when a child is in crisis, on how
22    we would end up handling a child in need due to
23    the fact that hands-on necessarily isn't always
24    a situation compared to, like, an adult because
25    I'm significantly larger than a child and how

Page 48

1    we would appropriately handle a child in a
2    crisis.
3 Q. And what does NASRO stand for?
4 A. I've got to look at it.  I don't recall.
5 Q. Let me give you a guess.  Is it the National
6    Association of School Resource Officers?
7 A. Yes.
8 Q. Okay.  Did you receive any specific training
9    when you became the Mosinee School District
10    student resource officer?
11        MS. ZELLNER: Object to form.
12        MR. ROMAN: I'll join.
13        EXAMINATION
14    BY MR. SECUNDA:
15 Q. You can answer.
16 A. When I became the school resource officer?
17 Q. So in, I think you testified, January of 2015.
18 A. Yes.  My first training would have been NASRO,
19    which I believe it's listed on here in August
20    of that same year.
21 Q. And when you say listed here, you mean Exhibit
22    63.  It looks like the NASRO training in 2015
23    is on page 4 of 5; is that correct?  NASRO
24    basic school resource officer?
25 A. Where do you see it on the page?

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 49

1  Q. So it's on page 4 of 5.
2  **A. I see it.  Yes.**
3  Q. Do you see it?
4  **A. Yep.**
5  Q. And is that annual training?
6  **A. No.  That's a one-time training.**
7  Q. And who conducts that training?
8  **A. The association itself.  NASRO does.**
9  Q. And is NASRO made up of school resource
10    officers from across the country?
11 **A. It's made up of just employees that end up**
12    **teaching.  So I don't -- it's made up of**
13    **ex-police officers, current police officers,**
14    **whoever they decide to have as their trainer.**
15 Q. Okay.
16      MR. SECUNDA: For everyone else in the
17    room, for what we sent you last night, it's the
18    Mosinee School District school resource
19    officer's policies.
20      (Krause Exhibit No. 64 marked for
21      identification.)
22      EXAMINATION
23  BY MR. SECUNDA:
24 Q. Officer Krause, I've just given you a document
25    marked as Exhibit 64 for purposes of

Page 50

1    identification for today's deposition.  Can you
2    tell me what that is after you've had a chance
3    to review it?
4  **A. It appears it's the agreement between the**
5    **Mosinee Police Department for the school**
6    **resource officer and the school.**
7  Q. And is it, in fact, entitled at the top,
8    Exhibit A, Mosinee Police Department School
9    Resource Officer Policy?
10 **A. Yes.**
11 Q. And it states its direct supervisor is the
12    police chief?  I'm on page 1.
13 **A. I was just looking.  I'm sorry.  Yes.**
14 Q. And work schedule is flexible.  I assume that,
15    you know, squiggle in front of the 4 means
16    approximately, but flexible, squiggle, four
17    hours per day?
18 **A. Yeah.  I don't know what the squiggle is.  But**
19    **yes.**
20 Q. It's probably --
21 **A. Four hours a day.**
22 Q. Okay.  Position is sworn and certified?
23 **A. Yes.**
24 Q. And this policy is dated September 1, 2007?
25 **A. Correct.**

Page 51

1  Q. Okay.  So are you familiar with this document?
2  **A. I'm familiar with the new document.**
3  Q. So this is not the current document for this
4    policy?
5  **A. Correct.**
6  Q. Do you know the date of the more current
7    policy?
8  **A. Would have been this year.**
9  Q. So 2022?
10 **A. Correct.**
11      MR. SECUNDA: Okay.  Let me just state
12    for the record, I'm not sure if this is
13    something the school district has or the police
14    department has.  But we would request --
15      MR. ROMAN: Yes.  That's fine.
16      MR. SECUNDA: -- the 2022 school
17    resource officer.
18      MR. ROMAN: Off the record.
19      (Discussion held off the record.)
20      MR. SECUNDA: So counsel in this case
21    just had a discussion off the record discussing
22    the fact that there is a new Mosinee Police
23    Department school resource officer policy that
24    was likely issued two to three months ago from
25    today's date.  We will be getting a copy of

Page 52

1    that report in the future.
2      EXAMINATION
3  BY MR. SECUNDA:
4  Q. But in the meantime, Officer Krause, I want to
5    go over this document, which is dated September
6    1, 2007.  Okay?
7  **A. Okay.**
8  Q. Are you familiar with this document from 2007?
9  **A. Yes.**
10 Q. And whether it be this document from 2007 or
11    the one that is the new school resource officer
12    policy from 2022, do you refer to it?  Do you
13    use it?
14      MS. ZELLNER: Object to form.
15      EXAMINATION
16  BY MR. SECUNDA:
17 Q. You can answer that.
18 **A. No.**
19 Q. So I'm going to refer to what is Bates stamped
20    as -- if you look at the bottom, it says,
21    Krause 0002.  Do you see that?
22 **A. I do.**
23 Q. And then you see on the first page there it
24    says, philosophy, slash, concept.  Can you take
25    a second, officer, and re-read the

Page 53

1　philosophy/concept on Krause 002?  And let me
2　know when you're finished.
3　**A. Okay.**
4　Q. When were you first presented with this
5　document?
6　**A. This year.**
7　Q. Were you presented this document -- and when I
8　say this document, let me be clear -- which we
9　have marked as 64 and is in front of you which
10　is dated September 1, 2007, would you have
11　received this when you first became a school
12　resource officer?
13　**A. No.**
14　Q. So you didn't receive this document until this
15　year, 2022?
16　**A. I received this document by our current chief,**
17　**Chief Grams.**
18　Q. And the form that you received the current
19　document in, in 2022, was the first time you
20　had seen this document?
21　**A. Correct.**
22　Q. Understood.  So now that you've read this
23　philosophy and concept section, would you agree
24　that, as the school resource officer at Mosinee
25　School District, you are responsible for

Page 54

1　protecting students and staff members?
2　**A. Yes.**
3　Q. And would you agree that staff members include
4　teachers?
5　**A. Yes.**
6　Q. And so when you do an investigation, you are
7　trying to protect both teachers and students,
8　correct?
9　**A. Yes.**
10　　　　**MS. ZELLNER:** Object to form.
11　　　　**MR. ROMAN:** Object to form and
12　foundation.
13　　　　　　**EXAMINATION**
14　　**BY MR. SECUNDA:**
15　Q. So let's turn the page, Officer Krause, to
16　what's labeled Krause 0003 at the bottom.
17　There is an outline of the tasks a school
18　resource officer performs.  Do you see that?
19　**A. The tasks performed, that section?**
20　Q. Yes.
21　**A. Yep.**
22　Q. One of the tasks, if you look with me -- I
23　believe it's task number 5 -- is participates
24　in school resource officer training.  Do you
25　see that?

Page 55

1　**A. I do.**
2　Q. And can you describe this, what it means to
3　participate in school resource officer
4　training?
5　**A. I can only assume what this means because this**
6　**was not something that was given to me**
7　**originally.  But that would be, like, your**
8　**NASRO training.**
9　　　　**When we had first started we were**
10　**doing monthly trainings or monthly meetings**
11　**with the other surrounding SROs.  I would**
12　**attend the yearly SRO conference.  So in**
13　**regards to those forms of trainings.**
14　Q. Understood.  Additionally, if you would turn
15　the page to Krause 0004, there are three other
16　tasks I want to focus on.  So first -- and this
17　is -- just to kind of show you where I am, this
18　is fourth down on page Krause 0004.
19　　　　It states, responds to and
20　investigates incidents or crimes, disorder and
21　traffic offenses on or near school property.
22　Do you see that?
23　**A. I do.**
24　Q. And can you describe that function to me that
25　you undertake?

Page 56

1　**A. That would be my general patrol duties, to**
2　**investigate crimes or any type of offense on**
3　**school property or surrounding, so within the**
4　**City of Mosinee.**
5　Q. Are there any types of offenses on the school
6　property that you do not investigate?
7　**A. If it's not a crime, I wouldn't investigate it.**
8　Q. So you only investigate something that is
9　potentially a crime at the school?
10　**A. Correct.**
11　Q. Okay.  Let's go down further.  It says right
12　under, conducts follow-up investigations
13　involving students who are victims, witnesses
14　or offenders.  Do you see that?
15　**A. Yes.**
16　Q. And can you describe that function to us?
17　**A. Would just -- would follow up with any type of**
18　**student or any type of an investigation to**
19　**determine or to gather more information in**
20　**regards to a case that's being investigated.**
21　Q. Okay.  And then, finally, two down from that it
22　states, makes arrests and takes offenders into
23　custody in compliance with the law and
24　department policy.  Do you see that?
25　**A. I do.**

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 57

1 Q. And can you describe that function?
2 A. To make an arrest I would need the probable
3   cause of the offender to put them into custody
4   following the law as well as our department
5   policy, which also is a copy of the law.
6 Q. Okay. So let's move on to the bottom of Krause
7   0004. And it goes onto the top of Krause 005.
8   The title is, police investigation and
9   questioning. Do you see that?
10 A. Yes.
11 Q. Okay. So pursuant to this question, you have
12   the authority to investigate incidents that
13   occur on school property; is that correct?
14 A. Yes.
15 Q. And when we say school property, I assume that
16   just -- that school property is not just the
17   physical building, but the grounds around
18   school property?
19 A. Anything that the school would own.
20 Q. Okay. What types of incidents or crimes do you
21   typically investigate pursuant to this
22   authority?
23      MS. ZELLNER: Object to form.
24      MS. LUBINSKY: I'll join.
25      MR. ROMAN: Join.

Page 58

1      MS. LUBINSKY: It's overly broad.
2      EXAMINATION
3   BY MR. SECUNDA:
4 Q. You can answer.
5 A. My typical ones that I would deal with -- I
6   deal with a lot -- are inappropriate pictures
7   being sent back and forth by youth, drugs,
8   vaping, and, like, physical altercations.
9 Q. And you can do that without the prior authority
10   of the principal?
11      MS. ZELLNER: Object to the form.
12      MS. LUBINSKY: I'll join.
13      EXAMINATION
14   BY MR. SECUNDA:
15 Q. Let me restate it. Can you start an
16   investigation of the sorts that you've just
17   described without receiving authorization, if
18   it's in the middle school, from Principal
19   Grube?
20      MS. LUBINSKY: I'll object to the
21   form.
22      EXAMINATION
23   BY MR. SECUNDA:
24 Q. Go ahead.
25 A. I don't need permission from Officer Grube if

Page 59

1   it's a violation of the law.
2 Q. You mean Principal Grube?
3 A. What did I say?
4 Q. Officer Grube.
5 A. Oh, did I? Yeah. Principal Grube.
6 Q. You just deputized him. I'm not sure you have
7   that power.
8      MR. ROMAN: He doesn't.
9      EXAMINATION
10   BY MR. SECUNDA:
11 Q. Okay. Understood. So under police
12   investigation and questioning, you have the
13   authority to investigate incidents on school
14   property, correct?
15 A. Correct.
16 Q. Okay. And when investigating these incidents,
17   am I right that you are authorized to interview
18   students?
19 A. Yes.
20 Q. And you are authorized to take their
21   statements?
22 A. Yes.
23 Q. Does this policy provide you with the authority
24   to interview the accused teacher or staff
25   member?

Page 60

1      MS. LUBINSKY: Object to the form.
2      MS. ZELLNER: Object to form.
3      MR. ROMAN: I'll join.
4      EXAMINATION
5   BY MR. SECUNDA:
6 Q. Go ahead. You can answer.
7 A. This would give me the authority to interview
8   anyone that I would feel necessary.
9 Q. Including staff members?
10 A. Yes.
11 Q. Including teachers?
12 A. Yes.
13 Q. Including administrators?
14 A. Yes.
15 Q. Is that something you typically do?
16      MS. ZELLNER: Object to form.
17      MS. LUBINSKY: I'll join.
18      MR. ROMAN: So will I.
19      EXAMINATION
20   BY MR. SECUNDA:
21 Q. Go ahead. You can answer.
22 A. Can you rephrase the question?
23 Q. Sure. Do you typically interview staff members
24   as part of your role investigating
25   criminal-type behavior at the school in

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 61

1    Mosinee?
2  A. If it involves them or I have a question for
3     them, yes.  But, typically, we don't have
4     involvement with staff or teachers.  It's
5     normally student and student or student and
6     parent.
7  Q. Okay.  And on page Krause 0005 -- so turn the
8     page, please -- you are provided with the
9     authority to make arrests; is that correct?
10 A. Yes.
11 Q. And are these arrests to be made on school
12    property, or are you authorized to make these
13    arrests wherever they're -- the person that
14    you're interested in is located?
15        MS. LUBINSKY: Object to the form.
16        MS. ZELLNER: Join.
17        EXAMINATION
18  BY MR. SECUNDA:
19 Q. You can answer.
20 A. I can make the arrest -- I don't have a
21    particular location that I can or can't make
22    the arrest.  If probable cause is met and
23    determines an arrest, I can make that arrest at
24    any location.
25 Q. Okay.  So I want to clarify something.  So we

Page 62

1     just talked about, not frequently, but you do
2     on occasion interview staff members,
3     administrators, teachers as part of your
4     investigations; is that correct?
5  A. Yes.
6  Q. Do you take their statements only when it
7     involves them, or do you also talk to them when
8     they're witnesses?
9  A. I would -- both.
10 Q. Both.  Okay.  Okay.
11        (Krause Exhibit No. 65 marked for
12        identification.)
13        EXAMINATION
14  BY MR. SECUNDA:
15 Q. Officer Krause, I have handed you what has been
16    marked for identification purposes as Exhibit
17    65.  Please take a second to review that.
18 A. Okay.
19 Q. Can you please identify what has been marked
20    Exhibit 65?
21 A. It appears to be the Mosinee Middle School
22    handbook.
23 Q. Okay.  And is it for the -- it looks like for
24    the academic year of 2020 to 2021?
25 A. Yes.

Page 63

1  Q. Okay.  And as you can see, if you look at the
2     bottom of this document labeled 65, it says,
3     Krause 0008.  Do you see that?
4  A. Yes.
5  Q. Okay.  So this was produced as part of your
6     responses to plaintiffs' discovery, correct?
7  A. Yes.
8  Q. So are you familiar with this document?
9  A. With the piece of paper in front of me, the
10    particular document, no.  But the handbook,
11    yes.
12 Q. Okay.  And is this something you refer to in
13    your capacity as a student resource officer at
14    Mosinee?
15 A. I have in the past, yes.
16 Q. How often?  Can you give me an approximation?
17 A. I couldn't recall.
18 Q. Okay.  Are the policies and procedures set
19    forth in this document something that you
20    enforce in your capacity as the student
21    resource officer at Mosinee?
22        MS. ZELLNER: Object to form.
23        MS. LUBINSKY: I'll join.
24        MR. ROMAN: I will join.
25        EXAMINATION

Page 64

1  BY MR. SECUNDA:
2  Q. You can answer.
3  A. Can you rephrase the question?
4  Q. Sure.  Are the policies and procedures set
5     forth in what has been marked document 65
6     something you enforce in your capacity as a
7     student resource officer at Mosinee?
8  A. The school's policies --
9        MS. LUBINSKY: Hold on.  I'm going to
10    object to the form.  Go ahead.
11        EXAMINATION
12  BY MR. SECUNDA:
13 Q. But you can answer.
14 A. The school policies or the police department
15    policies?
16 Q. The school policies.
17 A. I don't enforce the school polices.
18 Q. Then the police policies.
19 A. Police department policies I enforce.
20 Q. So is it your testimony that what's contained
21    here in Exhibit 65, student handbook and
22    planner, are not school policies?
23 A. This is school policies.
24 Q. So because they're school policies, you've just
25    testified you don't enforce school policies?

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 65

1  A. I should rephrase that. It's a policy that
2     would result in me to have to interact due to a
3     law enforcement issue, yes. But depending on
4     what policy you're speaking of, no.
5  Q. I'm going to unpack what you just said. So if
6     it's a school policy that involves law
7     enforcement duties that you have, then yes, you
8     enforce it?
9  A. Yes. So I can reference back to the resource
10    policy in here when it would come to a police
11    investigation and questioning. That's a policy
12    that would be set up that would allow me to
13    speak with individuals.
14        So that policy I would particularly
15    follow. But in regards to some of our other
16    school policies, say a cell phone policy, I
17    don't enforce cell phone policies. It's not
18    against the law.
19 Q. But if a cell phone policy infraction was part
20    of a criminal investigation, you would
21    investigate it?
22        MS. ZELLNER: Object to form.
23        MS. LUBINSKY: I'll join.
24        MR. ROMAN: Join.
25        EXAMINATION

Page 66

1  BY MR. SECUNDA:
2  Q. You can answer.
3  A. Depending on what was -- how the particular
4     device was used.
5  Q. Listen to my question again, please. If you
6     had a cell phone policy infraction under school
7     rules that was part of a criminal
8     investigation, you have the authority to
9     investigate that, do you not, officer?
10        MS. ZELLNER: Object to form.
11        MS. LUBINSKY: I'm going to join.
12        MR. ROMAN: So will I.
13        EXAMINATION
14 BY MR. SECUNDA:
15 Q. You can still answer.
16 A. It depends on the situation.
17 Q. Okay. Well, we will be coming back to one of
18    these situations.
19 A. Okay.
20 Q. So we will talk further about this. So let's
21    turn to what's labeled Krause 9, going over to
22    10. So just turn the page. So, in fact, if
23    you look at the chart on Krause 9, which is
24    part of Exhibit 65, it discusses the Mosinee
25    Middle School student personal cell phone use.

Page 67

1     Correct?
2  A. What page are we looking at?
3  Q. We're on Krause 9 at the bottom. It's the
4     chart. Do you see where it says using
5     personal --
6  A. Okay. Yes.
7  Q. -- or school wireless device at MMS?
8  A. Yes.
9  Q. I assume MMS is Mosinee Middle School, correct?
10 A. Correct.
11 Q. Okay. And so, for instance, if you go down to
12    row 3, it says, outdoor recess, and then in
13    parentheses, cell phone. Do you see that?
14 A. I do.
15 Q. Okay. And then across it has different
16    columns, listen to music, surf, pictures or
17    recordings. Do you see that?
18 A. Yes.
19 Q. Okay. So if I understand this correctly, this
20    is what is acceptable and not acceptable for
21    students to use their phones on school grounds?
22        MS. ZELLNER: Object to form.
23        MR. ROMAN: Object to form and
24    foundation.
25        MS. LUBINSKY: I'll join.

Page 68

1        EXAMINATION
2  BY MR. SECUNDA:
3  Q. You can answer.
4  A. This would be the school's policy that they
5     created on when they believe electronic devices
6     should be used.
7  Q. And does it also provide the consequences for
8     cell phone violations?
9  A. Yes. That would be on Krause 0010.
10 Q. Okay. And so you're looking at the top of
11    Krause 0010 where it's entitled at the top,
12    consequences for wireless violations?
13 A. Yes.
14 Q. Okay. Let's read those. So number 1 says,
15    confiscation of the device by classroom
16    teacher, slash, assistant. Student picks up
17    their device after school from the teacher or
18    office, period. Did I read that correctly?
19 A. You did.
20 Q. Let me read number 2. Confiscation of the
21    device by classroom teacher, slash, assistant.
22    Phone taken to the main office. Parent must
23    pick up the device from the principal or
24    assistant principal. Did I read that
25    correctly?

Page 69

1 **A. You did.**
2 Q. Okay. And then I'm going to read number 3,
3   which is the last one. Confiscation of the
4   device by classroom teacher/assistant. Office
5   discipline referral given. Phone taken to the
6   main office. Parent must pick up the device
7   from the principal or assistant principal.
8   Loss of privilege to have possession of any
9   device at school for one month. A student may
10   check their device in at the office during that
11   time.
12         Is that accurate, Officer Krause?
13 **A. Yes.**
14 Q. Thank you. And if you look also on Krause 10,
15   there is a section listed, classroom rules. Do
16   you see that in the second column?
17 **A. I do.**
18 Q. And under it, it says, each class has its own
19   specific classroom matrix of rules. Did I read
20   that right?
21 **A. Yes.**
22 Q. Okay. So in your opinion -- and I'm only
23   asking your opinion, not what the school
24   believes, but only in your opinion -- does the
25   school have an overarching cell phone policy?

Page 70

1         **MS. ZELLNER:** Object to form.
2         **MR. ROMAN:** Object to form and
3   foundation.
4         **MS. LUBINSKY:** I will as well.
5                  **EXAMINATION**
6   BY MR. SECUNDA:
7 Q. You can answer.
8 **A. Can you repeat it?**
9 Q. Sure. Is it your opinion, based on what we
10   just reviewed in Exhibit 65, that Mosinee
11   School District has an overarching cell phone
12   policy?
13 **A. What do you mean by overarching?**
14 Q. I'll take the word overarching out. Does the
15   Mosinee School District have a cell phone
16   policy?
17 **A. Yes. It has an electronic wireless device**
18   **policy, not a cell phone policy.**
19 Q. Well, let me bring you back to Krause 009 to
20   that chart that we looked at. Do you see that?
21 **A. Yes.**
22 Q. It does say the word, cell phone, doesn't it,
23   in that chart?
24 **A. In parentheses, yes.**
25 Q. Okay. And when Ms. Mathis was a school

Page 71

1   teacher -- well, let me take a step back
2   because I have to make some foundation here.
3   Do you remember when Ms. Christy Mathis was a
4   school teacher at the Mosinee Middle School?
5 **A. I do.**
6 Q. What was that time period?
7 **A. The entire time I had been employed from**
8   **2014 -- or when I started at the school in**
9   **2015, at the beginning of the year, to 2021, I**
10   **believe in April.**
11 Q. Okay.
12 **A. Yeah, April.**
13 Q. So from when you started in January of 2015 to
14   April of 2021; is that accurate?
15 **A. Yes.**
16 Q. Okay. And do you remember what her role was at
17   the Mosinee Middle School?
18 **A. Art teacher.**
19 Q. And do you know what grade levels she taught?
20 **A. I believe it was all grade levels.**
21 Q. And what does that include in the Mosinee
22   Middle School?
23 **A. Fourth, fifth, six, seventh, and eighth.**
24 Q. So fourth to eighth grade?
25 **A. Yes.**

Page 72

1 Q. Okay. So when Ms. Mathis was a teacher, did
2   she have the authority to enforce her own cell
3   phone policy?
4         **MS. ZELLNER:** Object to form.
5         **MS. LUBINSKY:** I'll object to form.
6   Foundation.
7         **MR. ROMAN:** I will join both.
8                  **EXAMINATION**
9   BY MR. SECUNDA:
10 Q. And now you can answer.
11 **A. Based off of the documentation in front of me,**
12   **yes. It's initialed WP along with teacher's**
13   **permission.**
14 Q. Okay. So she had the authority to enforce her
15   own cell phone policy, Ms. Mathis, during her
16   employment at Mosinee Middle School?
17         **MS. ZELLNER:** Object to form.
18         **MS. LUBINSKY:** I'm going to object to
19   the form. Foundation.
20         **MR. ROMAN:** I will join.
21                  **EXAMINATION**
22   BY MR. SECUNDA:
23 Q. It's hard when there's three different people.
24   So you can answer, officer.
25 **A. Based off of the document in front of me, yes.**

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 89

1     MR. SECUNDA: Let him answer for
2   himself.
3     MS. LUBINSKY: Hold on.  We have to
4   have an orderly way to do this.  You got to let
5   us get objections out on the record.  I object
6   to the form of that question.
7     MR. ROMAN: I do as well.  Thank you.
8         EXAMINATION
9   BY MR. SECUNDA:
10  Q. And I'm going to restate the question because
11    I'm sure you forgot it at this point.
12  A. Go ahead.
13  Q. Yes.  So your testimony -- because I just want
14    to make sure I understand what you're saying
15    because this is important.  Your testimony is,
16    if a student at Mosinee Middle School has their
17    cell phone taken away and they are upset about
18    it, that is not relevant to your investigation
19    into why the student filed a complaint against
20    that teacher?
21        MS. ZELLNER: Same objection.
22        MS. LUBINSKY: Same objection.
23        MR. ROMAN: Same objection.
24        THE WITNESS: It's looked into.  But
25    my relevance goes down to what physical facts

Page 90

1   are presented to me.  She could be upset
2   because she got a poor grade on a test.  She
3   could be upset because someone told her that
4   her shoes don't look nice.
5         I don't care if it's a cell phone or
6   what their -- necessarily their feelings are.
7   It's put into consideration.  But I don't look
8   for opinions or feelings.  I look for facts.
9         EXAMINATION
10  BY MR. SECUNDA:
11  Q. But isn't a fact what the child's motivation
12    is?
13  A. The motivation came forward as well as
14    witnesses that suggest that a crime had been
15    violated.
16  Q. Okay.  We'll get into whether a crime --
17    because, obviously, that's not what occurred,
18    right?  There was no probable cause, right,
19    officer?
20        MS. ZELLNER: Object to form.
21        MS. LUBINSKY: I'll object to the
22    form.  It is multiple.
23        MR. ROMAN: And I'll --
24        EXAMINATION
25  BY MR. SECUNDA:

Page 91

1   Q. Was there any --
2         MR. ROMAN: Wait a minute.  Let me --
3         MS. ZELLNER: You have to let us get
4   objections out.
5         MR. ROMAN: I would object.  It's
6   argumentative as well as to form.
7         MR. SECUNDA: Is everyone okay?  Let
8   me try again.
9         EXAMINATION
10  BY MR. SECUNDA:
11  Q. So your investigation into Ms. Mathis led to
12    her arrest, correct?
13  A. Yes.
14  Q. And it also led to her being criminally
15    charged, correct?
16        MS. ZELLNER: Object to form.
17        MS. LUBINSKY: I'll join.
18        MR. ROMAN: I'll join.
19        EXAMINATION
20  BY MR. SECUNDA:
21  Q. Her arrest led to her being criminally charged,
22    correct?
23  A. Are you asking me that?
24  Q. Yeah.
25  A. I thought you were talking to --

Page 92

1   Q. No.  I'm asking you.  They just can object, and
2     I can ignore them if I want.
3   A. Yes.
4   Q. Okay.  So -- and that criminal conviction was
5     found to have no probable cause by the criminal
6     court, correct?
7         MR. ROMAN: Object.
8         MS. ZELLNER: Object.
9         MR. ROMAN: I'm sorry.  Now I'm doing
10    it.  I'll object to form.
11        MS. LUBINSKY: I'll join.
12        MR. ROMAN: You said criminal
13    conviction.
14        MS. ZELLNER: Right.
15        MR. SECUNDA: Oh.  Okay.
16        EXAMINATION
17  BY MR. SECUNDA:
18  Q. That criminal complaint that was filed based on
19    your investigation was thrown out for a lack of
20    probable cause, wasn't it, Officer Krause?
21        MS. ZELLNER: Object to form.
22        MR. ROMAN: I will join.
23        MS. LUBINSKY: I will join.
24        THE WITNESS: The charge that the DA's
25    office requested, there was no probable cause

Page 93

1    for their request of the charge.
2         MR. SECUNDA: Okay. Why don't we -- I
3    want to -- I want to go and move in another
4    direction. We've been going for about an
5    hour-and-a-half. I think it's a good time for
6    a break. So why don't we take a break,
7    officer, please.
8         (Recess taken.)
9              EXAMINATION
10   BY MR. SECUNDA:
11   Q. Officer Krause, I have a few clean-up
12   questions. And I apologize. But with these
13   depositions, you always forget to ask questions
14   you meant to ask. So one of the things
15   actually I just heard you speaking about off
16   the record, which is, are you married, sir?
17   A. Yes.
18   Q. And how long have you been married?
19   A. Oh, geez.
20   Q. That's on the record.
21   A. 15 years.
22   Q. And do you have children?
23   A. I do.
24   Q. And how many children do you have?
25   A. I have three.

Page 94

1    Q. And how old are they?
2    A. I guess, what's the relevance of this? I'd
3       prefer not to talk about my family.
4    Q. Well, you do have to answer. But I will
5       explain, the relevance is to how children
6       behave sometimes. So we're going to get into
7       that. I'm not going to ask their names. I
8       don't want to know anything about them besides
9       how old they are.
10   A. I'd prefer not to answer.
11        MS. ZELLNER: I'm going to object to
12   form. He's asking you to answer the ages.
13              EXAMINATION
14   BY MR. SECUNDA:
15   Q. You have to answer.
16   A. Okay.
17   Q. I'm not going to do anything with it, officer.
18      I promise.
19   A. Okay. 10, 8 and 6.
20   Q. Got it. And that's all I wanted to know.
21      Okay. And then my other clean-up question was,
22      do you recall I asked you, what did you review
23      to prepare for today's deposition?
24   A. Yes.
25   Q. And you said, I believe, the criminal

Page 95

1    investigation?
2         MS. ZELLNER: Object to form.
3              EXAMINATION
4    BY MR. SECUNDA:
5    Q. It might have been the criminal complaint. Do
6       you remember what -- let me ask you again.
7       What did you review to prepare for today's
8       deposition?
9    A. The police department case file.
10   Q. The police department case file. Do you
11      remember how long you spent on that file
12      reviewing it?
13   A. A few hours.
14   Q. A few hours. Okay. And was there anything
15      else besides the police department case file
16      that you reviewed?
17   A. No.
18   Q. Okay. Thank you. So let's move on to -- let's
19      see. I'm going to talk a little bit about your
20      background as a police officer. I know we have
21      a little bit already. But remind me, how long
22      have you been a police officer now?
23   A. 16 years.
24   Q. 16 years. And would you say there's a type of
25      crime that you typically investigate as a

Page 96

1    police officer?
2         MS. ZELLNER: Object to form.
3         MS. LUBINSKY: I'll join.
4         MR. ROMAN: So will I.
5              EXAMINATION
6    BY MR. SECUNDA:
7    Q. You can answer.
8    A. Mental health is a big one that we investigate,
9       domestics, drug use, and assaults, physical or
10      sexual in nature.
11   Q. Okay. So before this case, meaning Ms. Mathis'
12      case, how many sexual assault cases would you
13      say you've investigated?
14   A. Over 50.
15   Q. Okay. And are those in both the school and
16      outside the school?
17   A. Yes.
18   Q. Can you give me, approximately, of those 50 or
19      so sexual assault cases, how many have been in
20      the school?
21   A. The majority of them.
22   Q. Okay. Let me bring your attention to a
23      particular case that I believe you
24      investigated. Do you know a gentleman by the
25      name of Derek Yirkovsky?

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 97

1 **A. I do.**
2 Q. And who is Derek Yirkovsky?
3 **A. He was a science teacher.**
4 Q. Do you remember what grades he taught?
5 **A. He taught seventh.**
6 Q. So he taught seventh grade science at Mosinee
7 Middle School?
8 **A. Yes.**
9 Q. Okay. Do you recall whether you investigated a
10 complaint concerning Mr. Yirkovsky?
11 **A. I did.**
12 Q. Okay. Do you remember the nature of that
13 complaint?
14 **A. We had a parent contact the police department.**
15 **They had found a diary in their daughter's**
16 **bedroom. Inside the diary, simply put, it**
17 **would be X-rated material that was written in**
18 **there.**
19 **After questioning of the individual,**
20 **we asked if this stuff that she's saying that**
21 **Derek Yirkovsky had done, what it was. And she**
22 **had stated that over 90 percent of what was in**
23 **that book were dreams that she was having, that**
24 **none of these things were physically happening.**
25 **We ended up having to go through a**

Page 98

1 **forensics interview. And she continued to say**
2 **that she was inappropriately touched by**
3 **Mr. Yirkovsky within the school.**
4 **In interview with kids that she had**
5 **put into place as well as the time frame that**
6 **she had given, we had pulled video footage to**
7 **determine if her statements were true. And her**
8 **statements were not true, had come down to the**
9 **conclusion that the statements she was making**
10 **had no proof that it occurred.**
11 Q. So do you recall whether -- prior to you
12 determining there was no merit to this child's
13 claim against Mr. Yirkovsky, whether he was
14 suspended from school?
15 **A. He was on a family leave for his new child.**
16 Q. Okay. Do you know if he was separately
17 suspended in light of this investigation?
18 **A. I don't know.**
19 Q. Do you recall during that investigation whether
20 you spoke to Mr. Yirkovsky during that
21 investigation?
22 **A. I did.**
23 Q. And I should ask as a foundation, do you
24 remember approximately when that occurred, the
25 time period of that complaint against him?

Page 99

1 **A. I don't.**
2 Q. Two years ago?
3 **A. That would have been this last school year, so**
4 **2022.**
5 Q. Okay. It was more --
6 **A. Prior to the end of school.**
7 Q. So it was more recent?
8 **A. Yes.**
9 Q. Okay. And you said you reviewed video
10 evidence, correct?
11 **A. Yes.**
12 Q. And that, essentially, cleared Mr. Yirkovsky?
13 **A. As well as the statements from the individuals**
14 **that she had stated were with her at the time**
15 **of the incident.**
16 Q. Understood. And did you talk to Mr. Yirkovsky
17 as part of that investigation?
18 **A. I did.**
19 Q. And you received his side of the story?
20 **A. I did.**
21 Q. And would you say, sitting here today, that
22 receiving his side of the story was helpful to
23 your investigation?
24 **A. Not at all.**
25 Q. And why not?

Page 100

1 **A. Because I was able to prove by statements from**
2 **the witnesses as well as video footage that**
3 **what she was claiming had happened had not**
4 **happened. So I didn't need his statement. I**
5 **was -- I had come to the conclusion prior to**
6 **even speaking with him that he did not do what**
7 **she was accusing him of.**
8 Q. So do you think it's important to talk to the
9 accused as part of an investigation into a
10 sexual assault?
11 **A. Yes.**
12 **MS. LUBINSKY:** Hold on. I'm going to
13 object to the form.
14 **MS. ZELLNER:** Join.
15 **MR. ROMAN:** I will join.
16 **EXAMINATION**
17 **BY MR. SECUNDA:**
18 Q. Let me restate the question.
19 **A. Okay.**
20 Q. Do you believe it is appropriate, as part of an
21 investigation into a sexual assault, that it is
22 important to talk to the accused as part of
23 that investigation?
24 **MR. ROMAN:** I will --
25 **MS. ZELLNER:** Same objection.

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

---

Page 101

1    MS. LUBINSKY: Join.
2    MR. ROMAN: Objection.
3    THE WITNESS: Yes.
4         EXAMINATION
5    BY MR. SECUNDA:
6    Q. Go ahead.  You can answer.  Yes.  Before or
7    after one is arrested, is it important?
8    MS. ZELLNER: Object to form.
9    MS. LUBINSKY: Join.
10   MR. ROMAN: Join.
11   THE WITNESS: It doesn't matter.
12        EXAMINATION
13   BY MR. SECUNDA:
14   Q. It doesn't matter?
15   A. No.
16   Q. So your technique -- and this is what we're
17   going to talk -- about your practice when it
18   comes to sexual assault investigations is to
19   arrest first and ask questions of the accused
20   later?
21   MS. ZELLNER: Object to form.
22   MS. LUBINSKY: Join.
23   MR. ROMAN: I will join.
24   THE WITNESS: Depends on the
25   situation.

---

Page 102

1         EXAMINATION
2    BY MR. SECUNDA:
3    Q. Well, let's talk about Ms. Mathis' situation so
4    we can be more concrete.  Okay?
5    A. Okay.
6    Q. Did you discuss the allegations against
7    Ms. Mathis before you arrested her?
8    A. No.
9    Q. Why not?
10   A. I was informed by the district attorney's
11   office to go and arrest her for the incident.
12   And under the directive of the district
13   attorney's office, that's what I ended up
14   doing.
15   Q. But you contacted the district attorney's
16   office first, did you not?
17   A. Two times, yes.
18   Q. And so you had the ability before you contacted
19   the district attorney's office to speak to
20   Ms. Mathis, correct?
21   A. I would have had -- I could have had the
22   opportunity, yes.
23   Q. But you didn't?
24   A. I did not, no.
25   Q. Why not?

---

Page 103

1    A. I had gathered information from my witnesses as
2    well as my victim that suggested that there was
3    probable cause that an incident occurred.
4    Q. And you came to that conclusion without
5    discussing the incident with Ms. Mathis?
6    A. Unless Ms. Mathis was going to straight-up tell
7    me she did it -- normally, in law enforcement
8    it's the other way around, saying, I did not do
9    something inappropriate.  So having the
10   evidence in front of me suggested there was
11   probable cause for an arrest.
12   Q. So is it your testimony, officer, that before
13   you arrested Ms. Mathis on April the 5th there
14   was nothing she could have said that would have
15   changed your mind to arrest her?
16   MS. ZELLNER: Object to form.
17   MR. ROMAN: I'll join.
18   MS. LUBINSKY: I'll join.
19   THE WITNESS: The evidence in front of
20   me suggested probable cause that she did
21   violate the law.
22        EXAMINATION
23   BY MR. SECUNDA:
24   Q. That's not my question.  My question is, if you
25   had spoken to Ms. Mathis before you arrested

---

Page 104

1    her, is there nothing she could have said that
2    would have changed your mind?
3    MS. ZELLNER: Same objection.
4    MS. LUBINSKY: I'll object to the
5    form.  Calls for speculation.
6    MS. LUBINSKY: I will join.
7    THE WITNESS: No.
8         EXAMINATION
9    BY MR. SECUNDA:
10   Q. You can answer.  I'm sorry?
11   A. I said no.
12   Q. So no, nothing would have changed your mind?
13   A. Nothing would have changed my mind.
14   Q. You believed you had probable cause regardless
15   of what Ms. Mathis had said to you?
16   A. Yes.
17   Q. Are you -- are you familiar, officer, with
18   the -- kind of the principal in law that you're
19   innocent until proven guilty?
20   A. Yes.
21   Q. Do you -- are you also familiar with the
22   principal that a person who's accused of a
23   crime should have the right to be heard?
24   MS. ZELLNER: Object to form.
25   MS. LUBINSKY: I'll join.

---

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 105

1    MR. ROMAN: I will join.
2    THE WITNESS: Yes.
3    EXAMINATION
4  BY MR. SECUNDA:
5  Q. And the opportunity to tell their side of the
6    story?
7  A. Yes.
8    MS. ZELLNER: Object to form.
9    MR. SECUNDA: And yet --
10    MR. ROMAN: Just wait a minute. I
11  would ask the witness to pause to allow --
12    THE WITNESS: Okay.
13    MR. ROMAN: -- the other attorneys --
14    MR. SECUNDA: It's hard because we're
15  getting into a conversation.
16    MR. ROMAN: Right. So just -- I
17  understand what's going on here.
18    THE WITNESS: Okay.
19    MR. ROMAN: But it's becoming hard for
20  the record. So I will join that objection.
21    MS. LUBINSKY: I will join that
22  objection, too.
23    EXAMINATION
24  BY MR. SECUNDA:
25  Q. What would you like me to do? Would you like

Page 106

1    me to repeat the question? Would that be
2    helpful?
3  A. Yes.
4  Q. Okay. So my question was, as part of an
5    investigation, is it not important to give the
6    accused the ability to tell their side of the
7    story?
8  A. It is important.
9  Q. And so, officer, if I were a police officer and
10    I thought you did something wrong, criminally
11    wrong, like a sexual assault, and I showed up
12    to your house to arrest you, would you not say,
13    why are you arresting me?
14    MS. ZELLNER: Object to form.
15    MS. LUBINSKY: I'll join.
16    MR. ROMAN: I will join as well.
17    THE WITNESS: I would ask that.
18    EXAMINATION
19  BY MR. SECUNDA:
20  Q. And wouldn't you want to know why you were
21    being arrested?
22    MS. ZELLNER: Object to form.
23    MR. ROMAN: I will join.
24    MS. LUBINSKY: I'll join.
25    THE WITNESS: Yes.

Page 107

1    EXAMINATION
2  BY MR. SECUNDA:
3  Q. And isn't it basic fairness that I give you the
4    opportunity to tell your side of the story?
5    MS. ZELLNER: Object to form.
6    MS. LUBINSKY: I'll join.
7    MR. ROMAN: I will join.
8    THE WITNESS: Yes.
9    EXAMINATION
10  BY MR. SECUNDA:
11  Q. But you didn't do that, did you, with Christy
12    Mathis?
13    MS. ZELLNER: Object to form.
14    MS. LUBINSKY: I will join.
15    MR. ROMAN: I will object to form and
16  foundation.
17    THE WITNESS: That's incorrect.
18    EXAMINATION
19  BY MR. SECUNDA:
20  Q. What did you do then?
21  A. I informed her of why she was being arrested,
22    read her her Miranda rights, and allowed her to
23    speak after her Miranda rights were read to
24    her.
25  Q. I understand that. But you didn't give her the

Page 108

1    opportunity to explain her side of the story
2    before you arrested her, did you, Officer
3    Krause?
4  A. No.
5  Q. Thank you. Okay. So let's go back to, I don't
6    know, kind of your general philosophy about
7    investigations, if you will. So what is the
8    purpose of an investigation when you do a
9    criminal investigation? How would you define
10    that?
11  A. It's fact gathering.
12  Q. Okay. And would you always conduct witness
13    interviews as part of fact gathering? Is that
14    a normal part of fact gathering?
15  A. Yes.
16  Q. Okay. And do you generally take written
17    witness statements as part of fact gathering?
18  A. It depends.
19  Q. Okay. What is it -- what would something like
20    that depend on?
21  A. If the witness wants to give a statement. We
22    can't force it. It's a voluntary statement.
23    Depending on if we need particular more
24    information regards -- my reports are more fact
25    based, as a written statement can be more

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 121

1    **THE WITNESS:** Yes.
2    **EXAMINATION**
3    **BY MR. SECUNDA:**
4    Q. Okay.  Now, when you talk about touching
5    someone, you've also mentioned that you don't
6    touch children, correct?
7    **MS. ZELLNER:** Object to form.
8    **EXAMINATION**
9    **BY MR. SECUNDA:**
10   Q. In this video, Exhibit 66, you stated that you
11   don't go around touching people's butt,
12   correct?
13   **MS. ZELLNER:** I would object to form.
14   I believe it misstates what he says.  I believe
15   he specified in school.
16   **EXAMINATION**
17   **BY MR. SECUNDA:**
18   Q. You don't go around touching students' butts in
19   school, correct?
20   A. Correct.
21   Q. Is there ever a time that you can touch a
22   student appropriately?
23   **MS. LUBINSKY:** I'm going to object to
24   the form.
25   **MS. ZELLNER:** Join.

Page 122

1    **MS. LUBINSKY:** Are we still in school?
2    **EXAMINATION**
3    **BY MR. SECUNDA:**
4    Q. Is there ever a time that an adult can touch a
5    student in school appropriately?
6    **MR. ROMAN:** Again, I'll object to
7    form.  Any adult?
8    **MR. SECUNDA:** Any adult.
9    **MS. ZELLNER:** Join.
10   **MR. ROMAN:** Parents?
11   **MR. SECUNDA:** Is there any -- let me
12   restate the question.  And I would ask for a
13   little leeway.  I think you're being a little
14   bit -- you're being a little interrupting at
15   this point.
16   **MR. ROMAN:** Okay.
17   **MR. SECUNDA:** And I would appreciate
18   you to let me run my deposition.  I know you're
19   only trying to help.  But -- I appreciate it.
20   **EXAMINATION**
21   **BY MR. SECUNDA:**
22   Q. Okay.  So do you believe that an adult in the
23   school, whether it be an administrator, a
24   teacher, or a staff member, can ever
25   appropriately touch a student in school?

Page 123

1    A. Appropriately?
2    Q. Yes.
3    A. Yes.  A high five is an appropriate touch.
4    Q. Okay.  How about if I touch a student, if I'm
5    one of those staff members that I've just
6    described, on the shoulder?  Is that an
7    appropriate touch?
8    **MS. ZELLNER:** Object to form.
9    **MS. LUBINSKY:** Join.
10   **MR. ROMAN:** I will join.
11   **THE WITNESS:** Depends on the eye of
12   the person being touched.
13   **EXAMINATION**
14   **BY MR. SECUNDA:**
15   Q. Okay, Officer Krause.  I come up to you -- and
16   I'm not going to do it, as you've said in your
17   video you're not going to do it.  I come behind
18   you.  And in talking to you, I touch you on the
19   shoulder.  Is that appropriate?
20   **MS. ZELLNER:** Object to form.
21   **MS. LUBINSKY:** Join.
22   **MR. ROMAN:** I will join as well.
23   **THE WITNESS:** No.
24   **EXAMINATION**
25   **BY MR. SECUNDA:**

Page 124

1    Q. That's not appropriate?
2    A. In my opinion, no.
3    Q. Is it against the law?
4    **MS. ZELLNER:** Object to form.
5    **MS. LUBINSKY:** Join.
6    **MR. ROMAN:** Join.
7    **THE WITNESS:** No.
8    **EXAMINATION**
9    **BY MR. SECUNDA:**
10   Q. So it's just -- given your own sense of space,
11   for you it's inappropriate?
12   A. Yes.
13   Q. But as a police officer, as the student
14   resources officer in the school, is it your job
15   to tell people what's appropriate outside of
16   the law as far as where they touch people?
17   **MS. ZELLNER:** Object to form.
18   **MR. ROMAN:** I will join.
19   **THE WITNESS:** It's all in the eye of
20   the beholder.
21   **EXAMINATION**
22   **BY MR. SECUNDA:**
23   Q. So you can tell a student -- strike that.  You
24   can tell a student in your role as a student
25   resources officer that they should not be

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

---

Page 125

1  touching a student on the shoulder?
2      MS. ZELLNER: Object to form.
3      MS. LUBINSKY: I'll join.
4      MR. ROMAN: I will join.
5      THE WITNESS: I don't believe anybody
6  should touch anybody.
7              EXAMINATION
8  BY MR. SECUNDA:
9  Q. But that's your personal view, correct?
10 A. Our school policy would state that you're not
11    supposed to be touching anybody.
12 Q. Do you have somewhere in your school policies
13    that you can point me?
14 A. I would have to refer to it.
15 Q. So teachers, in your mind, under school policy
16    at Mosinee Middle School are never supposed to
17    touch students under any circumstances?
18     MS. ZELLNER: Object to form.
19     MS. LUBINSKY: Join.
20     MR. ROMAN: I will join.
21     THE WITNESS: There are circumstances
22  that would allow you to touch a child.
23              EXAMINATION
24  BY MR. SECUNDA:
25  Q. What are those circumstances?

---

Page 126

1  A. If you have a child who is out of control and
2     he's an EBD child, if you would end up having
3     to put him in a CPI hold, that would be a
4     justified touch of a child.
5  Q. What's EBD, just for the record?
6  A. It would be our -- I don't recall what it
7     stands for.
8  Q. Could it be emotionally and behaviorally
9     disturbed?
10 A. I guess, yeah.
11 Q. Or something like that, some kind of an
12    emotional issue?
13 A. Yes.
14 Q. Okay. And CPI, that's another term you just
15    used?
16 A. That would be a technique to be able to control
17    a child with the least amount of restraints to
18    make sure that they don't hurt themselves or
19    others.
20 Q. So outside of an adult in the school setting
21    restraining a child in order to protect
22    themselves or protect another child, is there
23    any other time a teacher should be able to
24    touch a child?
25     MS. ZELLNER: Object to form.

---

Page 127

1      MR. SECUNDA: In your mind.
2      MR. ROMAN: I will join.
3      THE WITNESS: Like I said, it depends
4  on the circumstances. I'll use me and you, for
5  example. If we walk through the hallways and I
6  bumped into you or I needed to get around you,
7  excuse me, please, and I try to push you to the
8  side, that would be considered an appropriate
9  touch.
10             EXAMINATION
11  BY MR. SECUNDA:
12 Q. So let me see if I understand. So if I bumped
13    into you by accident, and whether I apologized
14    or not, because I might not have realized I
15    bumped into you, that would be an appropriate
16    touch. Correct?
17 A. Depends what part of my body you would touch
18    but.
19 Q. So let's be more specific. What if I was
20    trying to make my way behind you and
21    inadvertently bumped into you but didn't
22    realize it and I didn't apologize? Is that
23    still an appropriate touch?
24     MS. ZELLNER: Object to form.
25     MR. ROMAN: I'll join.

---

Page 128

1      THE WITNESS: Confused on how you
2  wouldn't know that you bumped into me.
3              EXAMINATION
4  BY MR. SECUNDA:
5  Q. Just not paying attention. It's inadvertent.
6  A. So are you asking, would that be considered an
7     appropriate touch?
8  Q. Yeah, in your mind.
9  A. Depends on what part of my body you touched.
10 Q. I touched your behind.
11 A. That would not be appropriate.
12 Q. Even though I did it by accident?
13 A. How do I know you did it by accident?
14 Q. Because I'm telling you in this hypothetical
15    that I did it by accident.
16     MR. ROMAN: And I will object as
17  argumentative.
18     MS. ZELLNER: Join.
19             EXAMINATION
20  BY MR. SECUNDA:
21 Q. So if I bumped into your backside by accident,
22    but I didn't realize it, would that be an
23    inappropriate touch?
24     MS. ZELLNER: Object to form.
25     MR. ROMAN: I will join.

---

Christy J. Mathis and Paul J. Mathis, individually vs
Mosinee School District, et al

Eric J. Krause
December 13, 2022

Page 257

1  Q. Understood.  So could they have charged her
2     with -- they.  Could the district attorney's
3     office have charged Ms. Mathis with first
4     degree sexual assault without your underlying
5     investigation?
6         MS. ZELLNER: Object to form.
7         MS. LUBINSKY: I'll join.
8         MR. ROMAN: I will join as well.
9         THE WITNESS: Are you asking could
10    have they charged her with first degree sexual
11    assault if I wouldn't have done an
12    investigation?
13            EXAMINATION
14    BY MR. SECUNDA:
15 Q. Well, yeah.  I'm asking if without your
16    investigation they would not have had the
17    necessary underlying facts to charge that
18    crime?
19        MS. ZELLNER: Object to form.
20        MR. ROMAN: I'll join.
21        MS. LUBINSKY: I'll join.
22        THE WITNESS: With my -- without my
23    investigation, they would have had nothing to
24    go off of.
25            EXAMINATION

Page 258

1    BY MR. SECUNDA:
2  Q. So I think your answer is -- and tell me if I'm
3     right -- that the DA relied upon your
4     investigation to determine to charge Ms. Mathis
5     with first degree sexual assault?
6         MS. ZELLNER: I would object to form.
7         MS. LUBINSKY: Join.  And I'll add
8     foundation.
9         MR. ROMAN: And I will add both
10    objections.
11        THE WITNESS: The district attorney's
12    office made the decision based off of the
13    evidence and the reports that were given to
14    them.
15            EXAMINATION
16    BY MR. SECUNDA:
17 Q. That was not my question, so I'm going to try
18    again.  My question was, could the district
19    attorney charge Ms. Mathis with first degree
20    sexual assault without the facts that you
21    brought forward to them as part of your
22    investigation?
23        MS. ZELLNER: Same objection.
24        MS. LUBINSKY: I'll object to form and
25    foundation.

Page 259

1         MR. ROMAN: I will join.
2         THE WITNESS: No.
3         MR. SECUNDA: And that's all the
4     questions I have.  Thank you, Officer Krause.
5     Anyone else have any questions?
6         MS. LUBINSKY: No.
7         (Whereupon, the deposition of Eric J.
8         Krause terminated.)
9                 * * * * *

Page 260

1
2
3
4
5
6
7            REPORTER'S CERTIFICATE
8
9
10  STATE OF WISCONSIN  )
                        ) ss.
    COUNTY OF WOOD      )
11
12
13
14        I, Meredith A. Kroening, do hereby
15  certify the foregoing transcript is a true and
16  correct transcription of my stenographic notes
17  taken in this proceeding.
18
19
20        MEREDITH A. KROENING
21
22
23
24
25